ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JEREMY D. MATZ
Assistant United States Attorney
Major Frauds Section
California Bar No. 199401
    1113 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0649
    Facsimile: (213) 894-6269
    Email: jeremy.matz@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>RICHARD A. MAIZE,<br><br>        Defendant. | No. CR 07-455-DDP<br><br>GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO DEFENDANT RICHARD A. MAIZE'S MOTION TO WITHDRAW PLEAS OF GUILTY; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION<br><br>Hearing: June 16, 2011<br>           10:00 a.m. |

Plaintiff United States of America, by and through its attorney of record, Assistant United States Attorney Jeremy D. Matz, hereby submits its Supplemental Opposition To Defendant Richard A. Maize's Motion To Withdraw Pleas Of Guilty.

This Supplemental Opposition is based on the attached Memorandum of Points and Authorities and Declaration, the Plea Agreement For Defendant Richard A. Maize, all files and records

1 of this case, and any further evidence and argument that may be
2 presented at the hearing on Maize's motion.

3 DATED: June 8, 2011                    Respectfully submitted,

4                                        ANDRÉ BIROTTE JR.
                                         United States Attorney
5
                                         ROBERT E. DUGDALE
6                                        Assistant United States Attorney
                                         Chief, Criminal Division
7

8                                        Jeremy D. Matz
                                         _____
9                                        JEREMY D. MATZ
                                         Assistant United States Attorney
                                         Major Frauds Section
10
                                         Attorneys for Plaintiff
11                                       United States of America

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

This Supplemental Opposition addresses Maize's claim that he should be allowed to withdraw his guilty pleas because his former counsel "grossly mischaracterized" his sentencing exposure. Pursuant to a stipulation between the parties and a Court order filed on May 11, 2011 (which order bifurcated the briefing and hearing of Maize's claims), the government's original Opposition did not address that claim.  Because the Court order was subsequently vacated, the Court should hear and rule on all of Maize's claims at the hearing on June 16, 2011.  Therefore, this Supplemental Opposition addresses the sentencing exposure claim.[1]

### II.

### ARGUMENT

**A.   A Defendant Generally Cannot Withdraw His Guilty Plea Because Of Erroneous Legal Advice Or Changed Expectations Regarding His Sentence**

A defendant cannot withdraw his plea just because he realizes his sentence will be higher than he had expected.  Such a realization does not constitute a fair and just reason to withdraw a plea.  United States v. Nostratis, 321 F.3d 1206, 1211 (9th Cir. 2003); see also Shah v. United States, 878 F.2d 1156, 1162 (9th Cir. 1989) ("[F]ear of receiving a harsh sentence, standing alone, [does not] constitute a 'fair and just' reason to withdraw a plea, even if counsel's initial advice as to length of plea [sic] turned out to be inaccurate.") (citing Little v.

---

[1]   Exhibits cited in this Supplemental Opposition were filed concurrently with the government's original Opposition.

1  <u>Allsbrook</u>, 731 F.2d 238, 241 (4th Cir. 1984) ("An attorney's 'bad

2  guess' as to sentencing does not justify plea withdrawal and is

3  no reason to invalidate a plea.")).  While the Ninth Circuit has

4  on occasion allowed a defendant to change his plea for such a

5  reason, it has done so only in exceptional circumstances.  <u>United

6  States v. Briggs</u>, 623 F.3d 724, 728-29 (9th Cir. 2010)

7  (distinguishing <u>United States v. Davis</u>, 428 F.3d 802, 805-08 (9th

8  Cir. 2005)).  Even where a defendant's attorney gives the

9  defendant erroneous legal advice concerning his sentencing

10 exposure, such advice generally does not warrant withdrawal of

11 the guilty plea if the plea agreement and Rule 11 colloquy

12 accurately inform the defendant of his sentencing exposure.  <u>See,

13 e.g.</u>, <u>United States v. Mayweather</u>, 634 F.3d 498, 506-07 (9th Cir.

14 2010) (correct advice re: sentencing in plea agreement and at

15 plea colloquy made defendant's claim that he had a mistaken

16 belief as to his sentencing exposure "demonstrably false").

17 **B.   Maize Cannot Withdraw His Guilty Pleas Just Because He Now
       Thinks His Sentencing Exposure May Be Different From What He**
18     **Thought Before**

19        **1.   On The Law, Maize's Belief That He May Be Sentenced
              More Leniently Than He Once Thought Does Not Constitute**
20            **A Ground To Withdraw His Pleas**

21        The Ninth Circuit has consistently held that a defendant may

22 not withdraw his guilty plea just because his expectations

23 concerning his likely sentence may have changed.  Not

24 surprisingly, most if not all of this precedent has arisen from

25 cases in which, after pleading, the defendant fears a higher

26 sentence than he previously thought he would receive.  <u>See, e.g.</u>,

27 <u>Nostratis</u>, 321 F.3d at 1211; <u>Shah</u>, 878 F.2d at 1162; <u>Mayweather</u>,

28 634 F.3d at 506-07.

However, the reasoning and logic of these cases apply with equal force here, where Maize claims that he should be let out of his plea because (supposedly) he is likely to receive a sentence substantially less than what he once believed.  First, a guilty plea is the defendant's admission that he in fact committed the crime.  A guilty plea is not a vehicle to obtain or avoid any particular sentence, and thus should not be annulled on the defendant's whim whenever he calculates that he need not have pled guilty in order to get a sentence acceptable to him.  Second, in a multi-conspirator scheme like this, a contrary ruling would encourage all defendants to play the odds by pleading guilty and then jockeying to be the final defendant sentenced -- as Maize has done here -- and would arbitrarily reward whichever defendant succeeded.  Maize wants to sit at the poker table only now that he can see the hands dealt to everyone else.  The serious procedure established by Rule 11 does not tolerate this.

Maize's claim now -- that "in retrospect" his co-schemers' sentences turned out lower than he predicted, so he should be let out of his guilty pleas (Motion at 4) -- depends entirely on Monday morning quarterbacking that the precedent does not countenance.  Maize complains about his former counsel's alleged "failure" to predict, in 2006 and 2007, sentences that the Court would not impose on co-schemers until 2010.  It is important to remember that when Maize confessed his crimes to the government in 2006 and then pled guilty in 2007, not a single defendant in this scheme had been sentenced.  By definition, a defense lawyer cannot "grossly mischaracterize" a client's sentencing exposure

by failing to evaluate events that have not yet taken place.
Maize was entitled to, and had, competent counsel.  He was not
entitled to an attorney with a crystal ball.

Maize relies heavily on Davis, 428 F.3d 802, for his
sentencing argument.  There, however, the district court and the
Ninth Circuit found that the defendant's lawyer had "grossly
mischaracterized" the sentencing exposure by informing the
defendant that probation was a possibility, when in reality
"there was little, if any, possibility that defendant would be
sentenced to probation or anything close to probation."  Id. at
805.

Here, in contrast, it was and still is entirely possible
that Maize could be sentenced consistently with former counsel's
advisory Sentencing Guidelines estimates.  Maize acknowledged
this by stipulating in his plea agreement to Sentencing
Guidelines factors that place his anticipated sentence very close
to where counsel estimated it would be.[2]  On this point, it bears
remembering that the first defendant to be sentenced in this
scheme was Charles Elliott Fitzgerald.  In October 2008 (more
than one year after Maize pled guilty), the Court sentenced
Fitzgerald to a straight Sentencing Guidelines 14-year sentence
-- no departures, no Booker variances.  This demonstrates that
long after former counsel supposedly "grossly mischaracterized"

_____

[2]     Plea Agreement ¶¶ 45, 51 (Maize's stipulation that his
total offense level for the conspiracy and bank fraud, after
acceptance of responsibility but prior to any substantial
assistance departure, is at least 25, translating to
approximately 4 1/2 to 6 years); compare with Novak Decl. Ex. B
(estimating minimum of 3-4 years after guilty plea to
information, prior to substantial assistance departure).

Maize's sentencing exposure -- and long before any other
defendant was sentenced more leniently -- the Court sentenced a
co-schemer consistent with the Sentencing Guidelines.  It was
clearly no "gross mischaracterization" for Maize's counsel to
estimate that the same could well happen to Maize, especially
when counsel did so before anyone had been sentenced.

Furthermore, after <u>Davis</u>, the Ninth Circuit clarified that
allowing a defendant to withdraw his plea because of a claimed
"gross mischaracterization" of his sentencing exposure is a rare
and exceptional event.  <u>Briggs</u>, 623 F.3d at 728-29 (defendant
could not withdraw plea even where he later realized that
exposure was nearly twice as high as he previously thought).
Maize's case does not qualify for such exceptional treatment.

### 2. On The Facts, No One "Grossly Mischaracterized" Maize's Sentencing Exposure

#### a. The Court And The Plea Agreement Accurately Informed Maize Of His Sentencing Exposure

Maize was accurately informed by the Court and by his Plea
Agreement of his sentencing exposure.  The plea agreement and
Rule 11 colloquy gave him the correct statutory maximum
sentences.  (Plea Agreement ¶¶ 8-11; Ex. G at 10-11).
Additionally, Maize reserved his right to seek any departures and
<u>Booker</u> / § 3553(a) variances that he might wish (Plea Agreement
¶¶ 52, 54), demonstrating that Maize knew that he could argue for
a sentence down to straight probation and that such a sentence
was possible.

The Court confirmed that Maize had discussed various
sentencing matters with his attorneys, including the advisory
Sentencing Guidelines and the § 3553(a) factors.  Importantly,

1  the Court specifically advised Maize that "any sentencing

2  recommendation or calculation in [his] plea agreement is not

3  binding on the Court," and Maize confirmed that he understood

4  this.  Maize's attorney told the Court that "we have made no

5  promises or representations as to what sentence [Maize] would

6  receive," and Maize did not contradict this.  (Ex. G at 13-14,

7  25-26).  Thus, the Court directly informed Maize that the

8  sentence could well be different from (including less than)

9  anything he had discussed with his attorneys, and Maize's

10  attorney confirmed that she had not guaranteed any particular

11  sentence.  These advisements undermine Maize's present claim that

12  he was assured he would be imprisoned for many years if he pled

13  guilty later or went to trial.  Maize's confirmation that he

14  understood that any sentence was possible carries "a strong

15  presumption of veracity," which the Court should credit in

16  denying his motion.  United States v. Mims, 928 F.2d 310, 313

17  (9th Cir. 1991).

18          b.  **Maize's Former Counsel Accurately Informed Maize**
                **Of His Sentencing Exposure**
19

20      Maize claims that his former counsel -- a highly experienced

21  O'Melveny & Myers ("O'Melveny") partner and former supervisory

22  white-collar federal prosecutor, who twice won one of the Justice

23  Department's most prestigious awards[3] -- "grossly

24  mischaracterized" his sentencing exposure by telling him that he

25  would go to prison for at least six and possibly over ten years

26  unless he pled guilty pre-indictment.  (Declaration of Richard

27  Maize ("Maize Decl.") ¶¶ 3, 9).  Maize's former counsel never

28  _____

      [3]    Declaration of Carolyn Kubota ("Kubota Decl.") ¶ 1.

told him any such thing.

O'Melveny spent a significant amount of time analyzing Maize's sentencing exposure under various scenarios.  This included analysis of Sentencing Guidelines enhancements, adjustments, and departures, as well as variances under 18 U.S.C. § 3553 and Booker.  O'Melveny shared this analysis with Maize and co-counsel.  O'Melveny repeatedly explained to Maize (1) how the federal sentencing system operates; (2) that the Sentencing Guidelines were not mandatory; (3) that the Court would not be required to impose a straight Guidelines sentence; and (4) that Maize could receive a lower sentence.  O'Melveny also explained to Maize that O'Melveny would vigorously argue for downward Booker variances, including contending that Maize's culpability, knowledge of, and role in the scheme would be overstated by a Guidelines sentence based on the total losses from the scheme. Maize clearly understood that this and other Booker-related factors could reduce his sentence below a straight Guidelines sentence.  (Kubota Decl. ¶¶ 7-8).

Maize claims that the PowerPoint slides shown to him by O'Melveny confirm that O'Melveny told him he would in fact go to prison for at least six and possibly over ten years unless he pled guilty pre-indictment.  (Maize Decl. ¶¶ 3, 4).  Maize mischaracterizes the PowerPoint demonstration.  The references to jail time in the slides are strictly O'Melveny's estimates of the advisory Sentencing Guidelines estimates under various scenarios. None of these estimates include any downward departures or variances that Maize might obtain, nor were they statements (much less guarantees) of the actual sentences that Maize would in fact

1   receive under the scenarios.  No O'Melveny attorney ever told

2   Maize that the estimated sentences would actually be the

3   sentences imposed.  To the contrary, O'Melveny specifically and

4   repeatedly explained to Maize that the estimated sentences were

5   merely that: estimates of the sentences called for by the

6   advisory Sentencing Guidelines, prior to any departures or

7   variances.  Maize had no misunderstandings or misimpressions

8   about this advice.  He never said anything that suggested he

9   thought O'Melveny's Sentencing Guidelines estimates were

10  statements, predictions, or guarantees of the actual sentences he

11  would receive.  (Kubota Decl. ¶¶ 11-13).

12      Maize claims that he was "incredibly frighten[ed]" by what

13  he claims was O'Melveny's statement to him about the certainty of

14  going to prison for six to over ten years if he did not plead

15  guilty pre-indictment.  (Maize Decl. ¶ 5).  In fact, just the

16  opposite was true: Maize repeatedly stated his belief that he

17  would get probation.  So that Maize would not have unrealistic

18  expectations, O'Melveny carefully explained to him that the

19  advisory Sentencing Guidelines would likely yield a custody

20  sentence, and that he should not plead guilty on the

21  understanding that he would get probation.  Nonetheless, it was a

22  challenge to convince Maize that a custody sentence was a

23  possible if not a likely outcome.  Maize's former counsel never

24  thought or had the impression that Maize believed or was afraid

25  that he would be sentenced to many years in prison.  To the

26  contrary, he was overly confident that he would avoid prison.

27  Maize's former counsel had the clear impression that Maize

28  understood his sentencing exposure and potential sentencing

1  outcomes, except to the extent he might have over-estimated his

2  chance at probation.  (Kubota Decl. ¶¶ 9, 13).

3      Maize claims that his former counsel's alleged "gross

4  mischaracterization" of his sentencing exposure unduly pressured

5  him into pleading guilty pre-indictment and thereby forgoing pre-

6  plea discovery, including of the witness statements that

7  supposedly show that he was innocent.  (Motion at 8-9).  His

8  former and present counsel carefully considered Maize's option to

9  wait for indictment and obtain discovery, but none of them

10 believed that was a better option for Maize.  All counsel agreed

11 that, even if some of the discovery corroborated Maize, the

12 evidence was nevertheless clear that Maize knew about fraudulent

13 aspects of the transactions, received hundreds of thousands of

14 dollars in undisclosed and unauthorized payments for his role,

15 and did not report the payments on his original tax return.

16 Furthermore, Maize had previously committed the mortgage fraud

17 against Countrywide (discussed in the government's original

18 Opposition), which counsel believed would make it impossible for

19 him to testify credibly in his own defense.  For these reasons,

20 former and present counsel all recommended that Maize take the

21 government's pre-indictment offer and try to obtain the most

22 lenient possible sentence.  (Kubota Decl. ¶¶ 6, 15-16).

23      c.  **Maize's Present Counsel Concurred In The
           Sentencing Advice And Recommendation To Plead**

24         **Guilty**

25     Maize's present attorney Stanley Marks, who has brought the

26 instant motion claiming that O'Melveny "grossly mischaracterized"

27 Maize's sentencing exposure, was co-counsel with O'Melveny before

28 and after Maize pled guilty.  Marks actively participated in the

1   discussions and meetings with Maize concerning Maize's sentencing

2   exposure.  Along with O'Melveny, Marks explained the federal

3   sentencing process to Maize, including the Sentencing Guidelines,

4   departures, and variances.  Marks never told O'Melveny that he

5   thought Maize had misunderstood his sentencing exposure, or that

6   Maize was afraid he would actually receive a straight Guidelines

7   sentence consistent with O'Melveny's advisory Guidelines

8   estimates.  Furthermore, Marks concurred with O'Melveny's

9   assessment that Maize would very likely be found guilty at trial,

10  and joined in the recommendation that Maize plead guilty pre-

11  indictment, even before obtaining discovery.  (Kubota Decl. ¶¶ 6,

12  8, 14, 16).  The Court can certainly question the validity of

13  Maize's "gross mischaracterization" claim when one of the lawyers

14  now making that claim on Maize's behalf affirmatively joined in

15  the sentencing advice and guilty plea recommendation about which

16  Maize complains.[4]

### III.

### CONCLUSION

19       For the foregoing reasons, the Court should deny Maize's

20  motion to withdraw his guilty pleas.

---

23       [4]     Marks now claims that he believes that Maize
24  "experienced great fear that [O'Melveny's] predictions about the
    punishment he would experience if he did not waive indictment and
25  plead guilty would be borne out as correct."  (Declaration of
    Stanley H. Marks ("Marks Decl.") ¶ 18).  Marks shared no such
26  concern about Maize's "fear" with any of his co-counsel,
    including O'Melveny.  Based on Marks' active participation in the
27  case and his independent communications with Maize, former
    counsel has no doubt that Marks would have addressed and
28  corrected any fear, uncertainties, or misunderstandings on
    Maize's part.  (Kubota Decl. ¶ 14).

# DECLARATION OF CAROLYN J. KUBOTA

I, Carolyn J. Kubota, hereby declare as follows:

1.      I am an attorney licensed to practice law in the State of California. I am a partner at the law firm of O'Melveny & Myers LLP ("O'Melveny"), which I joined in January 2000. My practice focuses on trials, white collar defense, and commercial litigation. In my criminal practice, I have represented both individuals and entities in cases involving allegations such as securities fraud, mortgage fraud, health care fraud and investor fraud, as well as environmental crimes, violations of the Foreign Corrupt Practices Act, and national security violations. Before joining O'Melveny, I taught at UCLA Law School for two years. Before that, I served as an Assistant United States Attorney ("AUSA") in the United States Attorney's Office ("USAO") for the Central District of California for about twelve years. During my tenure as an AUSA, I served as Deputy Chief of the Major Frauds Section and prosecuted a wide range of fraud cases, including bank fraud, loan fraud, securities fraud, investor fraud, and mail and wire fraud. I twice won the United States Department of Justice's Director's Award for Superior Performance, presented by the Attorney General. I received my B.A. and J.D. degrees from Cornell University. As an AUSA and as a defense attorney, I have worked on numerous sentencing proceedings in federal criminal cases. When I first started as an AUSA in 1986, the United States Sentencing Guidelines ("Guidelines") were not yet in effect. Since then, I have litigated sentencing proceedings under multiple iterations of the Guidelines, both before and after the U.S. Supreme Court declared them to be advisory in United States v. Booker, 543 U.S. 200 (2005).

2.      From 2003 through about June 2008, O'Melveny represented Richard A. Maize as a target and defendant in a mortgage fraud investigation and prosecution conducted by the USAO and federal law enforcement agencies. Beginning in about the summer of 2006, I was the lead O'Melveny partner representing Maize. Maize subsequently retained two additional sets of counsel to represent him in this matter, Stanley Marks of Denver, Colorado, and Bill Weissberg of Century City. O'Melveny, Marks and Weissberg jointly represented Maize and worked closely together on the case until Weissberg's death in 2007; O'Melveny and Marks continued their joint and coordinated representation until early 2008.

3.      In July 2006, the USAO informed O'Melveny that Maize was a target of the mortgage fraud investigation.  In October 2006, Maize participated in a proffer session pursuant to a limited immunity agreement.  In May 2007, Maize signed a plea agreement, and in August 2007, he pled guilty to (a) conspiracy to commit bank fraud and loan fraud; (b) bank fraud; and (c) false statement on a tax return.

4.      In May and June 2011, I was interviewed by the USAO pursuant to a Waiver Of Attorney-Client Privilege And Attorney Work-Product Doctrine ("Waiver") signed by Maize and one of his present attorneys.  Maize's present attorneys attended those interviews and advised me that Maize consented to my participation in them.  I make this Declaration pursuant to the same Waiver.  A copy of the Waiver is attached as Exhibit "1" to this Declaration.

5.      In the course of our representation of Maize, O'Melveny obtained thousands of pages of documents concerning the mortgage transactions at issue and Maize's role in those transactions.  The Court-appointed Receiver in related civil litigation was one of our primary sources for these documents.  O'Melveny attorneys reviewed the documents in detail and analyzed the transactions.  We met and spoke many times with Maize and our co-counsel Marks and Weissberg about the contents of the documents and our analyses of the transactions.

6.      Based on the contents of the documents, our discussions with Maize and our co-counsel, and our understanding of the USAO's evidence, it was our assessment that Maize had little or no likelihood of being acquitted at a trial of this case.  We believed there were aspects of the mortgage fraud scheme of which Maize was ignorant, such as the degree to which the appraisals were inflated.  We also believed that the evidence clearly established his knowledge of a fraudulent scheme and his knowing participation in it.  For example, the evidence showed that Maize knew about the use of straw borrowers and false verifications of deposit in the loan applications.  Maize had received hundreds of thousands of dollars for his participation in the fraudulent loan transactions, which payments were not disclosed to or authorized by the lenders.  Additionally, he had previously committed a similar mortgage fraud against Countrywide Home Loans.  Because of the Countrywide fraud, of which we knew the government was aware, as well as other evidence relating to Maize's credibility, we believed it would be impossible for Maize to

- 2 -

1    testify credibly in his own defense.  For these reasons, we recommended to Maize that he plead

2    guilty and try to obtain the most lenient possible sentence.  Co-counsel Marks and Weissberg

3    concurred with our assessment that Maize would very likely be found guilty at trial, and joined in

4    our recommendation that Maize plead guilty.

5           7.     O'Melveny spent a significant amount of time analyzing Maize's sentencing

6    exposure under various scenarios.  We shared our analysis with Maize and our co-counsel,

7    including Marks, and discussed it at length.  Among other matters, we analyzed how the parties

8    and the court might calculate the losses from the mortgage fraud and tax violations, and how

9    those losses might be attributed to Maize.  We considered the adjustments (such as abuse of trust)

10   that might be applied to Maize, and the downward departures and variances Maize might obtain

11   under the Sentencing Guidelines, 18 U.S.C. § 3553, and Booker.

12          8.     O'Melveny, as well as co-counsel Marks and Weissberg, discussed these

13   sentencing-related issues extensively with Maize.  We repeatedly explained to him how the

14   Sentencing Guidelines operated, including the system of enhancements, adjustments, and

15   departures.  We also repeatedly explained to him that the Sentencing Guidelines were not

16   mandatory and were only the starting point in the ultimate determination of his sentence.  Booker

17   was relatively new (having been decided in 2005) and it was not entirely clear how the decision

18   would be applied by sentencing courts going forward, especially in light of the fact that significant

19   time might pass before Maize was sentenced.  Nonetheless, we clearly explained to Maize that the

20   Court would not be required to impose a straight Guidelines sentence, and that he could receive a

21   lower sentence.  We told Maize that there were strong arguments under Booker which we could

22   and would make vigorously on his behalf.  In particular, we told Maize that a Guidelines sentence

23   based on the total losses from the scheme would likely overstate his culpability, knowledge of,

24   and role in the scheme.  We told Maize that we planned to argue for a reduction of his sentence on

25   that basis and that, if successful, the resulting reduction could be significant.  We also discussed

26   with Maize other Booker-related factors, such as his charitable and community activities and

27   family responsibilities.  Maize clearly understood that all of these factors could reduce his

28   sentence below a straight Guidelines sentence.

9.      During our discussions, Maize repeatedly stated his belief that he would receive a sentence of probation. We were concerned that Maize might be too optimistic in this respect, and were careful not to give him unrealistic expectations. We explained to him that the Sentencing Guidelines -- while advisory -- would likely yield a custody sentence and some scenarios would yield a lengthy prison sentence. We told Maize that while we could and would argue for much less, he should not plead guilty on the understanding that he would receive probation. Maize resisted accepting the possibility that he might have to go to jail and, throughout our representation, it was a challenge to convince him that a custody sentence was a possible if not a likely outcome. I never thought or had the impression that Maize believed or was afraid that he would be sentenced to many years in prison. If anything, he was overly confident that he would not go to prison.

10.     I have reviewed Exhibit B to the Declaration of Richard G. Novak, filed in support of Maize's Motion To Withdraw Pleas Of Guilty. Exhibit B, entitled "Options", is a portion of a lengthy deck of PowerPoint slides that O'Melveny prepared and presented to Maize.

11.     The references to jail time in the slides included in Exhibit B are strictly O'Melveny's estimates of the advisory sentences that the Sentencing Guidelines would call for under various scenarios. These estimates were based on a thorough and detailed analysis of the facts of the case, the Guidelines, and case law interpreting the Guidelines. These estimates were not statements, much less guarantees, of the actual sentences that Maize would, in fact, receive under these scenarios. These estimates do not include downward departures or variances under the Sentencing Guidelines, § 3553, or Booker (including for cooperation). Specifically:

a.      The reference to "minimum of 3 to 4 years" in slide 33 (Ex. B, p.3) is O'Melveny's estimate of the advisory sentence under the Sentencing Guidelines if Maize pled guilty to an information and did not require the USAO to indict him. The reference in this slide to "(possible reduction based on substantial assistance)" shows that the 3-4 year estimate was pre-departure and pre-variance.

b.      The reference to "between 6 to 10 plus years" in slide 34 (Ex. B, p.4) is O'Melveny's estimate of the advisory sentence under the Sentencing Guidelines (pre-departure

1   and pre-variance) if Maize required the USAO to indict him but pled guilty after indictment.

2               c.       The reference to "more than 10 years" in slide 35 (Ex. B, p.5) is

3   O'Melveny's estimate of the advisory sentence under the Sentencing Guidelines (pre-departure

4   and pre-variance) if Maize fought the charges at trial and lost.

5           12.      No O'Melveny attorney, including myself, ever told Maize that the estimated

6   sentences in Exhibit B would actually be the sentences imposed under the various scenarios.  For

7   example, no O'Melveny attorney told Maize that he would go to prison for at least six, and

8   possibly ten or more, years if he exercised his right to be indicted and later pled guilty.  No

9   O'Melveny attorney told him that he would go to prison for more than ten years if he exercised his

10  right to go to trial and lost.  To my knowledge, neither Marks nor Weissberg made any such

11  statements to Maize either.  To the contrary, we specifically and repeatedly explained to Maize

12  that the estimated sentences in Exhibit B were exactly that: estimates of the sentences called for

13  by the advisory Sentencing Guidelines, prior to any departures or variances.

14          13.      Maize never said anything to me (or, to my knowledge, to any of his other

15  attorneys) that suggested he thought these estimates were statements, predictions, or guarantees of

16  the actual sentences he would receive.  We made absolutely clear that we could not predict,

17  promise or state with certainty what sentence Maize would receive and that there was a wide

18  range of possible outcomes.  As stated above, Maize did not appear concerned or frightened that

19  he would ultimately spend significant time in custody.  Instead, he appeared overly optimistic that

20  he would avoid custody.  Maize participated fully in our meetings and discussions regarding his

21  sentencing exposure.  Based on the fact that he is articulate, intelligent, and actively participated

22  in our discussions, I believe Maize would have readily voiced any questions or uncertainties he

23  had about his sentencing exposure.  It was my clear impression that Maize understood his

24  sentencing exposure and the potential sentencing outcomes he faced, except, as stated above, to

25  the extent that he might have over-estimated the possibility that he would receive probation.

26

27

28

14.     Co-counsel Marks actively participated in O'Melveny's discussions and meetings with Maize concerning Maize's sentencing exposure, including our Sentencing Guidelines analysis, our estimates of the advisory sentences that the Guidelines would call for under various scenarios, and our analysis of possible departures and variances.  Marks never told me (or, to my knowledge, other co-counsel) that he thought Maize failed to completely understand, or misunderstood, his sentencing exposure.  Marks never told me (or, to my knowledge, other co-counsel) that Maize was afraid he would actually receive a sentence consistent with our advisory Sentencing Guidelines estimates, with no departures or variances.  Because Marks actively participated in the case, and because he and Maize freely communicated with each other separate and apart from O'Melveny's communications with Maize, I have no doubt that Marks would have corrected any such uncertainties and misunderstandings if he believed Maize actually had them, and addressed any such fear if he believed Maize actually felt it.  We at O'Melveny would certainly have done the same.

15.     As part of advising Maize, we had to recommend to Maize whether he should accept the USAO's offer to plead guilty to an information (and thereby forgo post-indictment discovery), or whether he should exercise his right to indictment in order to obtain discovery.  We carefully considered and exhaustively discussed both options.

16.     No one, including Marks, believed that waiting to be indicted was a better option for Maize, even though it would enable us to obtain discovery.  All counsel agreed that, even if some of the discovery corroborated Maize's position that he was ignorant of certain aspects of the fraud scheme (such as the degree to which the appraisals had been inflated), the evidence would nevertheless clearly establish that Maize (a) knew about fraudulent aspects of the loan transactions, such as the use of straw borrowers and false verifications of deposit; (b) had received hundreds of thousands of dollars in undisclosed and unauthorized payments for his role in submitting the inflated loan applications; and (c) had not reported the payments on his original 2001 tax return.  Based on our discussions with the USAO and our review of the documentary evidence, we knew that the USAO had strong evidence of the foregoing facts, and we explained to Maize that the defense would have no good rebuttal to this evidence.  All co-counsel, including

- 6 -

1   Marks, held a final conference call to decide whether we would recommend to Maize that he

2   accept the USAO's plea agreement offer.  All co-counsel, including Marks, agreed to do so.

3            I declare under penalty of perjury that the foregoing is true and correct to the best of my

4   knowledge and belief.

5   Dated: June 8, 2011

6                                                    CAROLYN J. KUBOTA
                                                     O'Melveny & Myers LLP

## WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND ATTORNEY WORK-PRODUCT DOCTRINE

This Waiver Of Attorney-Client Privilege And Attorney Work-Product Doctrine is executed by Richard A. Maize ("Maize") on this 20th day of April, 2011.

Maize has filed a motion to withdraw his guilty pleas in United States v. Maize, CR 07-455-DDP ("the Maize case"). In connection with that motion, Maize expressly and completely waives and gives up any and all rights that he may have to assert the attorney-client privilege as to all communications requested or inquired into by the United States Attorney's Office for the Central District of California ("USAO"), whether written, oral, or otherwise, to the extent the communications:

1.   Occurred before June 18, 2008;

2.   Were by, between, or among any of the following: Maize, any attorney(s) who represented or represent Maize, and any such attorney(s)' staff or employees; and

3.   Relate to the potential or actual sentence(s) that Maize could or would receive, or to which Maize could or would be exposed, in the investigation or prosecution of the Maize case. Communications within the scope of this waiver include communications relating to the reason(s) for any attorney's analyses, opinions, predictions, or advice concerning potential or actual sentence(s). Communications by or on behalf of Maize are excluded from the scope of this waiver to the extent that such communications (a) relate to the underlying facts, evidence, or theories of defense of the Maize case on liability; and (b) do not relate to potential or actual sentence(s).

In connection with the same motion, Maize expressly and completely waives and gives up any and all rights that he may have to assert the protections of the attorney work-product doctrine as to any material requested or inquired into by the USAO, in any form, to the extent the material:

1.   Was created or prepared before June 18, 2008;

2.   Was created or prepared by any attorney(s) who represented or represent Maize, or such attorney(s)' staff or employees; and

3.   Relates to the potential or actual sentence(s) that Maize could or would receive, or to which Maize could or would be exposed, in the investigation or prosecution of the Maize case. Material within the scope of this waiver includes material

EXHIBIT 1

relating to the reason(s) for any attorney's analyses, opinions, predictions, or advice concerning potential or actual sentence(s). Material memorializing statements by or on behalf of Maize is excluded from the scope of this waiver to the extent that such statements (a) relate to the underlying facts, evidence, or theories of defense of the Maize case on liability; and (b) do not relate to potential or actual sentence(s).

Maize understands that the attorney-client privilege generally protects against compelled disclosure of confidential communications between a client and his attorney relating to legal advice sought from or given by the attorney. Maize further understands that the attorney work-product doctrine generally protects against compelled disclosure of material created by an attorney in anticipation of or during litigation. Maize further authorizes any and all attorneys, staff, and employees within the scope of this waiver to disclose to the USAO, upon request or inquiry by the USAO, all communications and material described above. Maize has discussed these waivers with his present counsel, and Maize confirms that they are knowing, voluntary, and freely given. Maize's present counsel concurs in the waivers. No one has threatened or coerced Maize, or made any promises to him, to pressure or induce him to make these waivers.

Dated: _____4-2 8_____, 2011    _____
                                Richard A. Maize

Dated: _____4-20-2_____, 2011   _____
                                Richard G. Novak, Esq.
                                Attorney for Richard A. Maize


In the Maize case, the USAO will not offer in evidence at any point during any trial any communications or material obtained pursuant to this Waiver. The USAO makes no agreement concerning whether the USAO may or will use such communications or material for any other purpose, including (but not limited to) at any stage of the Maize case other than trial.

Dated: _____April 21_____, 2011   _____
                                  Jeremy D. Matz
                                  Asst. U.S. Attorney
                                  Central District of California

2