ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JEREMY D. MATZ (Cal. Bar No. 199401)
Assistant United States Attorney
Major Frauds Section
1113 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-0649
Facsimile: (213) 894-6269
email: jeremy.matz@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 07-455-DDP |
| Plaintiff, | **GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT RICHARD A. MAIZE** |
| v. | [EXHIBITS FILED CONCURRENTLY HEREWITH] |
| RICHARD A. MAIZE, | |
| Defendant. | Sentencing: September 12, 2011 2:30 p.m. |

Plaintiff United States of America, by and through its attorney of record, Assistant United States Attorney Jeremy D. Matz, hereby submits its Sentencing Position For Defendant Richard A. Maize.

This Sentencing Position is based on the attached Memorandum of Points and Authorities, the Plea Agreement For Defendant Richard A. Maize ("Plea Agreement"), the Presentence Investigation Report and Sentence Recommendation ("PSR") for

1  Maize (as revised on July 5, 2011), the Exhibits filed

2  concurrently herewith, all files and records of this case, and

3  any further evidence and argument that may be presented at

4  Maize's sentencing hearing.

5  DATED: August 29, 2011          Respectfully submitted,

6                                   ANDRÉ BIROTTE JR.
                                    United States Attorney
7
                                    ROBERT E. DUGDALE
8                                    Assistant United States Attorney
                                    Chief, Criminal Division
9

10

11                                   JEREMY D. MATZ
                                    Assistant United States Attorney
                                    Major Frauds Section
12
                                    Attorneys for Plaintiff
13                                   United States of America

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                        ii

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . .  v

I.   INTRODUCTION  . . . . . . . . . . . . . . . . .  1

II.  FACTS  . . . . . . . . . . . . . . . . . . . .  3

     A.   Maize's Prior Mortgage Fraud  . . . . . . .  3

     B.   The Fitzgerald-Abrams Mortgage Fraud  . . . . . . . .  4

     C.   Maize's Integral Role In Assisting
          The Fitzgerald-Abrams Mortgage Fraud  . . . . . . .  5

     D.   Maize's Kickbacks From The Fitzgerald-Abrams
          Mortgage Fraud  . . . . . . . . . . . . . .  8

          1.   The Maize-Abrams Kickback Agreement  . . . . . .  8

          2.   The Kickbacks To Maize  . . . . . . . . . .  10

     E.   Maize's Concealment Of The Kickbacks
          On His Tax Return  . . . . . . . . . . . . .  10

     F.   Maize's Concealment Of The Kickbacks
          From The Victim Banks, Including His Employer,
          And His Cover-Up Of The Mortgage Fraud  . . . . . .  11

     G.   Maize's Efforts To Clean Up His Image
          After His Guilty Plea And In Preparation
          For Sentencing  . . . . . . . . . . . . . .  15

III. GOVERNMENT'S SENTENCING RECOMMENDATION  . . . . . . . .  18

     A.   Maize Deserves A Custody Sentence . . . . . . . .  18

          1.   The Sentencing Guidelines Call For At Least
               A 97-Month Sentence  . . . . . . . . . .  18

               a.   Maize Has Denied Responsibility  . . . .  18

               b.   Maize Did Not Play A Minor Role
                    In The Fraud  . . . . . . . . . . .  20

          2.   The § 3553(a) Statutory Factors
               Firmly Support A Custody Sentence  . . . . . .  21

iii

**TABLE OF CONTENTS (continued)**

                                                                    PAGE

            a.   The Nature And Circumstances Of
                 Maize's Crimes, And His History And
                 Characteristics, Justify A
                 Custody Sentence . . . . . . . . . . . .   21

            b.   A Custody Sentence Will Reflect
                 The Seriousness Of Maize's Offenses,
                 Promote Respect For The Law,
                 And Provide Just Punishment . . . . . . .  23

            c.   A Custody Sentence Will Deter
                 Criminal Conduct . . . . . . . . . . . .   24

            d.   A Custody Sentence Will Avoid
                 Unwarranted Sentencing Disparities
                 Among Similarly-Situated Defendants . . .  24

     B.   The Court Should Order Maize To Pay Significant
          Additional Restitution . . . . . . . . . . . . .  26

          1.   Unlike All Other Defendants In This Case,
               Maize Is Still Very Wealthy And Can
               Easily Pay Additional Restitution . . . . .  27

          2.   Maize Has Paid No More Than $3,619,041
               In Restitution  . . . . . . . . . . . . . .  29

          3.   Pursuant To The Plea Agreement,
               The Court Should Enter A Restitution
               Judgment Against Maize Now  . . . . . . . .  31

     C.   The Court Should Place Maize On Three Years
          Of Supervised Release Following Imprisonment . .  33

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . .   33

iv

1

## TABLE OF AUTHORITIES

2  FEDERAL CASES:                                              PAGE

3  United States v. Burrows,
4        36 F.3d 875 (9th Cir. 1994) . . . . . . . . . . . 19

   United States v. Carty,
5        520 F.3d 984 (9th Cir. 2008) . . . . . . . . . 18

6  United States v. De Leon,
7        603 F.3d 397 (7th Cir. 2010) . . . . . . . . . 19

   United States v. Newson,
8        46 F.3d 730 (8th Cir. 1995) . . . . . . . . 18, 19

9  United States v. Sensmeier,
10       361 F.3d 982 (7th Cir. 2004) . . . . . . . . . 28

   United States v. Tonks,
11       574 F.3d 628 (8th Cir. 2009) . . . . . . . . . 19

12 STATUTES:

13 18 U.S.C. § 3553(a) . . . . . . . . . . . . . 18

14 18 U.S.C. § 3664(h) . . . . . . . . . . . . 27, 32

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    v

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.

## INTRODUCTION

On August 1, 2007, defendant Richard A. Maize pleaded guilty to conspiracy to commit bank fraud and loan fraud; substantive bank fraud; and making a false statement on a tax return.

Maize committed these felonies by assisting Charles Elliott Fitzgerald and Mark Abrams in perpetrating a massive real estate mortgage fraud, and by taking hundreds of thousands of dollars in illegal kickbacks from them for his integral participation. Maize was a founder and co-owner of Americorp Funding ("Americorp").  Knowing that the Fitzgerald-Abrams loan applications were replete with bogus and false information -- including lies about who the borrowers were, how much money they had, who was making the down payments, and how much the homes really cost -- Maize nonetheless ran more than 40 of those applications through Americorp en route to the victim banks during the mortgage fraud.  Maize did this in return for Fitzgerald and Abrams kicking back 1/2 of 1% of every loan to him.  Because every loan was well over $1,000,000, Maize pocketed hundreds of thousands of dollars in these kickbacks.  He hid over $175,000 of these kickbacks from the IRS on his 2001 federal tax return, which he filed months after the point when even he admits he knew how inflated the loans were.

As an officer of one of the victim banks, Maize breached his fiduciary duties and abused the trust that the bank placed in him.  Even when he stopped participating in the fraud, he covered it up, hid it from his employer, extorted Fitzgerald and Abrams

1

for more money, and did nothing to safeguard a second victim bank from a further $24,000,000 loss that was well within his power to prevent. When the fraud came to light, Maize continued to lie to his employer about the kickbacks and his knowledge that the loans were illegal.

Most recently, Maize tried to get out of his guilty plea, claiming that he had no knowledge of or intent to commit any fraud and did not lie on his tax return. He blamed his prior counsel for his decision to plead guilty. The Court denied his motion.

Maize now appears to be sentenced. The United States Probation Office ("USPO") carefully analyzed the case and also considered Maize's positive attributes. Weighing all of those factors, the USPO recommends a sentence of 27 months in custody, additional restitution, and 3 years of supervised release. Claiming that he was a victim of his co-conspirators and that he should still get credit for accepting responsibility, Maize asks the Court for straight probation.

The government believes that the USPO's recommendation is well-founded and amply supported. Recognizing the Court's discretion, the government recommends a sentence of between 18 and 27 months in custody, plus restitution and supervised release as recommended by the USPO. This sentence will appropriately recognize the seriousness of Maize's crimes and also his mitigating circumstances. Perhaps most importantly, this sentence will avoid the enormous, unwarranted sentencing disparities that a sentence of straight probation would create.

II.

FACTS

A.   **Maize's Prior Mortgage Fraud**

Maize has been in the real estate business since 1972.  (PSR ¶ 90).  The Fitzgerald-Abrams scheme, from 2000-2003, was not the first time that Maize committed a mortgage fraud.  To the contrary, in 1994 -- years before Maize had ever heard of Abrams -- Maize and a business partner spearheaded a highly similar mortgage fraud against Countrywide Home Loans.

Maize and his partner purchased San Fernando Valley homes in the name of a trust, resold them to straw borrowers, obtained inflated appraisals, and deceived Countrywide into funding loans so inflated that they were higher than the homes actually cost. Maize's role was to locate the straw borrowers and package the inflated appraisals with the loan applications.  Maize and his partner did this about twelve to fifteen times, over six to ten months.  As an example, Maize and his partner bought a home for $250,000, but inflated it to $350,000 in order to get an 80% -- or $280,000 -- loan.  Through this fraud, Maize made money by buying properties without making any down payment and borrowing cash to improve the homes without going through the construction loan process.  Maize knew that (1) the appraisals were inflated higher than the true purchase prices; (2) the loans obtained were higher than the true purchase prices; and (3) the straw buyers were not the real buyers.  Maize hid these transactions from his business partners at Americorp because the transactions were

3

illegitimate.   (Ex. A (10/13/06 Maize interview report) at 5-7).[1]

**B.   The Fitzgerald-Abrams Mortgage Fraud**

As the Court is aware, Fitzgerald, Abrams, Maize, and others committed the mortgage fraud through several steps, including:

- Locating homes for sale in exclusive and expensive neighborhoods throughout California.
- Recruiting straw borrowers with superior credit to serve as the named borrowers.
- Buying the homes at their true market values.
- Sending false loan application packages through Americorp to Aurora Loan Services ("Aurora"), an underwriting agent for Lehman Brothers Bank ("Lehman"). The packages falsely made it appear that straw borrowers with substantial income and assets were buying the homes for millions of dollars more than their true purchase prices.   In reality, Fitzgerald and Abrams were buying the homes at their true market values.   In these bogus loan transactions, Americorp acted as a correspondent.   That meant that, after Aurora/Lehman approved the loans and committed to buy them, Americorp initially funded the loans and then sold them to Lehman for a profit.   After Maize and his Americorp co-owner Thomas Schiff sold Americorp to RBC Mortgage Company ("RBC"), RBC initially funded the

---

[1]     At sentencing, Maize may deny or try to spin the facts about his fraud against Countrywide.   However, the facts are set forth here exactly as Maize himself described them, in an interview with the government before he pled guilty.   (Ex. A at 5-7).   The government already knew about Maize's Countrywide fraud before he agreed to be interviewed.

1        loans and then sold them to Lehman.

2   **C.   Maize's Integral Role In Assisting The Fitzgerald-Abrams**
        **Mortgage Fraud**

3

4        Maize claims that he was "non-essential and inconsequential

5   . . . to Abrams' plans."  (Maize Sentencing Position at 25).

6   Although Fitzgerald and Abrams were able to continue the fraud in

7   its second phase without Maize and Americorp, Maize certainly did

8   everything he could to get in and stay in the fraud for as long

9   as possible.  As he admitted in his Plea Agreement:

10          From the beginning of my association with Abrams,
            I emphasized that it was beneficial for [Abrams] to do
            business with and through Americorp, by acting as a
11          third-party originator.  I told Abrams that [his
            company] was only a mortgage broker and that Americorp
12          could do much more as a mortgage banker.  I told Abrams
            that the only way for [Abrams] to send loan application
13          packages to Aurora was for [Abrams] to broker the loans
            to Americorp, which would then use its correspondent
14          relationship with Aurora to submit the loans to Aurora.
            I told Abrams about Aurora's underwriting guidelines
15          for its loan products and forwarded those guidelines to
            Abrams.

16
    (Plea Agreement ¶ 15).[2]

17
        Maize's basic role in the Fitzgerald-Abrams fraud was to
18
    (1) use his and Americorp's prestige and connections with
19
    lenders, especially Aurora/Lehman, to facilitate the fraud; and
20
    (2) help get the loans closed whenever problems or issues arose.
21
    In this regard, the Court should note that it was Maize -- not
22
    Abrams -- who had the contact with senior underwriters at
23

24   _____

25          [2]    Maize claims that his "normal practice at [Americorp]
    was not to accept third party originated loans," but that he
26   almost reluctantly made an exception for Abrams.  (Maize
    Sentencing Position at 15).  That is not the way Maize described
27   it to the government.  Then, Maize admitted that in his early
    dealings with Abrams, he "was trying to get [Abrams] to act as a
28   third party originator."  (Ex. A at 11).

                                    5

Aurora.[3]  Abrams had no pre-existing business relationship with Aurora/Lehman at all, and (especially in the fraud's earlier phase) needed Maize to assist in clearing any obstacles in the underwriting process.  One example is 815 Stradella Road, which Fitzgerald and Abrams bought in May 2001 (using Fitzgerald's brother Michael as the straw borrower).  The real price was $1,550,000, but Fitzgerald and Abrams inflated it to $4,950,000. They got a massive loan of $2,920,000 (nearly double the real price) from Aurora/Lehman.  About a week before the scheduled closing, Aurora rejected the loan application.  Maize reached out to Carl Peterson, a senior underwriter at Aurora, and wrote:

> Carl,
>
> I know the efforts you are making on the Fitzgerald file (per our conversation) and do appreciate it.  I also know that you are finding out the reason for the denial to the exception and see if you can put it back together at a lower LTV [loan-to-value ratio] and some price increase.  What I am getting is a seller (and buyer) wanting to close this in the worst way.  I am trying to back off so that you can do the best you can do.  Any chance putting this to rest (in a positive way of course) tomorrow (Tuesday)?  Again, thanks for your effort.
>
> . . .
>
> Thanks Again
> Rich

(Ex. D (settlement statements for 815 Stradella Road, showing real and inflated purchase prices and loan amount); Ex. 3458 (05/07/01 Maize email to Peterson)).

---

[3]     In his own words, Maize had a "great relationship" with Carl Peterson, who was one of Aurora's chief underwriters.  (Ex. B (01/10/11 Maize deposition) at 119).  Maize and Peterson had numerous conversations regarding loan files; Maize would call and ask how he could do the deal.  Maize "knew what he was doing." (Ex. C (08/27/04 Peterson interview report) at 4).

6

1    Maize knew that Fitzgerald and Abrams were the real buyers

2 in this phony transaction, but nonetheless weighed in with the

3 underwriter as if it were truly an arm's-length deal with an

4 independent seller and buyer.  With Maize's help, the inflated

5 loan funded a week later.  Two days after the closing, Maize got

6 a $14,500 kickback -- almost exactly 1/2 of 1% of the inflated

7 loan.  (Exs. 3430, 3500).

8    Many of Maize's claims in his Sentencing Position are

9 completely unsupported and unproven.[4]  In one glaring example, he

10 claims that his "belief that the loans were aboveboard was

11 further reinforced by the fact that [on various occasions, an]

12 independent appraiser concluded that both the appraisals and the

13 loan documents were aboveboard and within industry standards."

14 (Maize Sentencing Position at 17).  Maize cites no evidence for

15 this, and the government is aware of none.  To the contrary, when

16 the victim banks tried to get independent reviews of the inflated

17 appraisals in order to test the value estimates, they were shut

18 down by Fitzgerald and Abrams.  For example, at Lehman's

19 insistence, an independent appraiser was hired to review co-

20 schemer Lila Rizk's inflated appraisal of 2055 Stradella Road.

21 He concluded that "[Rizk's] appraisal is grossly inflated, and

22 something is afoot."  Fitzgerald and Abrams obviously did not

23 make Lehman aware of this.  Instead, they concocted their own

24 review appraisal, falsely concurring with Rizk's inflated value.

25 _____

26    [4]    Examples include Maize's claim that RBC failed to
perform quality control checks on the loan applications (Maize
27 Sentencing Position at 18) and Maize's claim that he tried to
find Fitzgerald after Fitzgerald fled (Maize Sentencing Position
28 at 51).

Maize got a kickback of almost $8,400 on this property.  (Exs. 653 (Lehman demand for review appraisal), 655 (false review appraisal supplied by Fitzgerald and Abrams), 701 (kickback to Maize), 3617 (complaint against Rizk by independent appraiser)).

**D.   Maize's Kickbacks From The Fitzgerald-Abrams Mortgage Fraud**

   **1.   The Maize-Abrams Kickback Agreement**

   Shortly after Maize and Schiff sold Americorp to RBC, they began to claim that RBC was shortchanging them.  Maize and Schiff "were enraged with the treatment they were receiving from RBC." When Abrams offered to give them all of the money that he was supposed to make from the loans that Americorp was helping him to obtain from Lehman,[5] they saw it "as a way to get back at RBC." (Ex. E (02/15/08 Maize interview report) at 1-2).[6]

   Maize now claims that "the payments, in [his] mind, were not tendered in return for [him] turning a blind eye to Abrams' and Fitzgerald's fraudulent intentions."  (Maize Sentencing Position at 19).  Once again, Maize attempts to re-write history, and the Court should not believe it.  Maize admitted to the government:

> Maize felt that the reason Abrams paid them the kickback was so that Maize would keep his "head in the sand" and not cause problems with these deals.

---

   [5]   As the third-party originator, Fitzgerald and Abrams were supposed to receive a commission of 1% of each loan. However, because they were fraudulently making millions of dollars from the massive inflation of the loans, they were happy to kick this 1% commission (which usually amounted to about $15,000 on each loan) back to Maize and Schiff.

   [6]   Regardless of whether Maize or RBC had the better of this financial dispute, Maize cannot possibly contend that defrauding and breaching his fiduciary duties to his employer was justified because of the disagreement.  In any event, Maize admitted that "RBC had a leg to stand on, so Maize and Schiff lost the argument on this issue."  (Ex. E at 2).

. . .

These payments were for Maize to look the other way. (Ex. A at 19-20).

Maize tries to characterize the kickbacks as "gratuities," as if (for nearly two years) Abrams were a diner and Maize his waiter. "Gratuity" is defined as "a favor or gift, usually in the form of money, given in return for service." (Webster's II New Riverside University Dictionary (1984) (emphasis added)). At the same time, Maize claims that he "was largely uninvolved [and] merely rubber-stamped the loans and passed them on to RBC for initial approval, after which they were sold to [Aurora]." (Maize Sentencing Position at 16). It is hard to imagine what kind of legitimate service Maize possibly could have been providing, such that he earned himself hundreds of thousands of dollars, if he was "largely uninvolved" and merely a "rubber-stamp." The answer, of course, is that Maize provided no such legitimate service, but rather (as he admitted) took hundreds of thousands of dollars in return for looking the other way, hiding what he knew about the lies in the loans, and helping get the loans through.

As Maize admitted, his kickbacks depended on the inflated loans. He received them only if and when he successfully assisted Fitzgerald and Abrams in obtaining an inflated loan. (Ex. E at 2 ("[t]he payments from Abrams were tied to the loan activity . . . . Maize made it clear to Schiff that they would only get money from Abrams each time a loan closed, and dependent on the loan closing.").

    2.   **The Kickbacks To Maize**

In 2001, Maize received more than $205,000 in kickbacks from Fitzgerald and Abrams.  (Ex. 3500).  In 2002, he received almost $136,000 in kickbacks.  (Ex. 3501).  These were checks only, and do not include cash, which Maize admitted also receiving from Abrams.  (Ex. A at 20 ("[w]hen they were paid cash, Abrams' employees would deliver the cash in an envelope with the cash subdivided for Maize and Schiff")).

The way that Maize ordered Abrams to pay the kickbacks shows that Maize knew full well that they were dirty.  In addition to checks made payable to himself, Maize directed Abrams to cut checks to Maize's credit cards, his bank accounts, "cash," and even his wife.  (Exs. 3500, 3501; Exs. 3464, 3466 (04/16/02 and 05/28/02 Maize emails to Abrams, directing payments to credit cards, cash, and Maize's wife)).  Maize greedily anticipated every kickback.  (Ex. 6401 (04/16/01 Maize email: "[l]ooks like one more check for $7500 each from Abrams" was on its way); Ex. 6402 (04/23/01 Maize email: "yipee yipee," $38,500 in kickbacks on their way to Maize); Ex. 6407 (06/18/01 Maize email: "53 dimes by 2" (i.e., $53,000 in kickbacks, to be split between Maize and Schiff, on their way from Abrams)).

**E.  Maize's Concealment Of The Kickbacks On His Tax Return**

On October 15, 2002, Maize signed his 2001 federal tax return, under penalty of perjury.  By that time, as even Maize admits, he had known for months that the loans on which he had received so many kickbacks for so long were severely inflated. (Maize Sentencing Position at 23).  Nonetheless, he lied on his tax return and deliberately concealed more than $175,000 in

10

kickbacks that he had received in 2001 from Fitzgerald and Abrams. (Plea Agreement ¶¶ 34-36).

**F.   Maize's Concealment Of The Kickbacks From The Victim Banks, Including His Employer, And His Cover-Up Of The Mortgage Fraud**

As Maize acknowledges (Maize Sentencing Position at 19), there was no way that RBC or Aurora/Lehman could tell from the loan documents that he was receiving kickbacks from Fitzgerald and Abrams, because the settlement statements did not disclose those kickbacks. Instead, the settlement statements merely showed that Fitzgerald and Abrams received the 1% fee for serving as the third-party originator, without ever revealing that they kicked this fee back to Maize and Schiff.

Maize was the President of RBC's Americorp division. He had fiduciary duties to RBC, including the duty to alert RBC that it was being defrauded into funding inflated mortgage loans. In blatant violation of his fiduciary duties:

> Maize . . . never informed RBC about the 1% that [he was] receiving from Abrams . . . . It was clearly understood [between Maize and Schiff] that they would not be telling RBC. [They] were in such disagreement with RBC [that] there was no question that they would not be telling RBC.

(Ex. E at 4).

In his Plea Agreement, and under oath before the Court, Maize repeatedly admitted that he knew long before July 2002 that the loan applications contained false information. (Plea Agreement ¶¶ 26-33). However, even crediting Maize's current, self-serving version of the events, he knew full well by that time that the loans were outrageously inflated. (Maize Sentencing Position at 23). At any time thereafter, Maize could

11

have notified -- indeed, he was obligated to notify -- RBC about the mortgage fraud.  He could have helped RBC get to the bottom of the fraud and mitigate its damages.  And perhaps most importantly, had Maize done so, he would have helped prevent Fitzgerald and Abrams from inflicting more than $24,000,000 in additional losses on Lehman.  This second phase of the fraud necessarily would have been avoided entirely, because had RBC known, it would have had to alert Lehman, which never would have accepted any further loans from Fitzgerald and Abrams.  RBC and Lehman also would have alerted criminal authorities, which they were only able to do almost one year later when they finally discovered the fraud.

But Maize did none of this.  Instead, he and Schiff jointly covered up the fraud and began a campaign of demanding money from Fitzgerald and Abrams.  Maize even repeatedly, and falsely, told Abrams that RBC knew all about the fraud and that the demands were actually coming from RBC, when in reality they were just Maize's and Schiff's private demands.  Maize's own emails prove this:

> Mark,
>
> There has been no sales, no appraisals, no refinancing . . . it is so difficult to continue to report this to Chicago [RBC's headquarters].  You know it has been 4 weeks since they gave me the list of requirements.  I have given them nothing substantial in return.  I am really nervous this time when I let them know I have nothing again.  Not even 1 submission to refi.
>
> Rich

(Ex. 6421 (08/06/02 Maize email to Abrams)).

1   And again in October 2002:

2   Tom and I just got off the phone with 3 guys from
    Chicago . . . They want us to put a detailed list of
3   the disposition of all the properties.  It was pretty
    ugly.
4
    Please help.
5
(Ex. 3843 (10/02/02 Maize email to Abrams)).
6
7       This was all a pack of lies by one fraudster (Maize) to his

co-schemer (Abrams).  In reality:
8
        Nothing was disclosed to anyone at RBC regarding any
9       conversations or confrontations between Maize and
        Abrams.  RBC did not authorize or issue a list of
10      requirements for Abrams to meet . . . .  Maize told
        Abrams that RBC's Chicago office was bearing down on
11      them by requiring that loans be refinanced and that
        [Fitzgerald and Abrams] put funds on deposit.  None of
12      what Maize told to Abrams was true.

13  (Ex. F (06/10/04 interview report of Brad Simon, RBC General

14  Counsel) at 9).

15      Even in 2003, after the fraud had been discovered and

16  litigation had begun, Maize continued to lie to RBC about the

17  kickbacks.  RBC commenced an internal investigation and

18  interviewed Maize and Schiff about the loans and kickbacks.  At

19  first, Maize claimed that the kickbacks had been loan repayments

20  by Abrams on a promissory note in favor of Maize, which of course

21  was false.  In July 2003, RBC re-interviewed Maize, who admitted

22  that he had lied about the kickbacks in the earlier interview.

23  (Ex. F at 9).

24      Maize now claims that his year-long cover-up beginning in

25  July 2002 was a good faith "repair plan," even if it proved to be

26  inadequate.  (Maize Sentencing Position at 24-25).[7]  This is a

27  _____

28      [7]   Maize attributes this "repair plan" to his so-called
                                                    (continued...)

                                13

1  lame excuse.  First, even as he tells it, the "repair plan"
2  consisted of refinancing the homes with supposedly legitimate
3  loans.  As Maize well knows, and well knew then, that was
4  impossible to do without sticking some other lender with the same
5  losses that RBC and Lehman ultimately suffered.  This was because
6  -- as Maize knew by July 2002 at the latest -- the loans were so
7  wildly inflated that no new mortgages could possibly pay them off
8  unless the new mortgages were also inflated above the true values
9  of the homes.  Second, Maize admits that no more than a few
10  months had passed before it was clear that his "fix-it plan" was
11  yielding "little real progress."  (Maize Sentencing Position at
12  25).  If Maize's goal really were to get RBC and Lehman out of
13  trouble, he would have told them the truth upon realizing that
14  his initial plan was failing.  Even then, however, he kept hiding
15  what he knew from the victim banks.

16      Maize makes much of the purportedly "myriad ways in which
17  [he], unlike Mr. Schiff, has done his best to help the victims in
18  this case."  (Maize Sentencing Position at 5).  The truth is that
19  Maize did absolutely nothing to help them until he was forced to

20  _____

21      [7](...continued)
22  psychological "Achilles Heel," which supposedly derives from his
   desire to please everybody all of the time.  Apparently, Maize
23  could not bear the thought of disappointing Abrams (even after he
   knew that Abrams was a major fraud artist), and hence came up
   with the "repair plan" as a way to give Abrams a chance to make
24  it all right.  The psychologist who coined the "Achilles Heel"
   term for Maize apparently knows nothing about Maize's history of
25  mortgage fraud, dating back to the Countrywide scheme years
   before Abrams.  It appears that the psychologist was given no
26  information to review except Maize's Plea Agreement -- none of
   Maize's emails and none of Maize's proffer session admissions to
27  the government.  If the psychologist was in fact made aware of
   Maize's history, his failure to address it makes his conclusions
28  highly suspect.

1  do so by their internal investigations, their lawsuits, and

2  eventually, his criminal prosecution.  When it really counted --

3  when the fraud was a steamroller inflicting millions of dollars

4  in losses every month -- Maize decided it was better to keep

5  quiet about his kickbacks than try to put a stop to it.  Maize's

6  silence and cover-up reveal far more about his role in and

7  culpability for this fraud than any depositions he has given or

8  repayments he made after he was caught and prosecuted.

9  **G.   Maize's Efforts To Clean Up His Image After His Guilty Plea
          And In Preparation For Sentencing**

10      The government does not dispute that Maize has made

11 significant charitable and community contributions.  Nor does the

12 government question that Maize's daughter is sincerely committed

13 to the causes she believes in.  However, the Court should be

14 aware of the context for at least some of Maize's community

15 service.  The evidence shows that Maize closely coordinated his

16 activities in the Rochelle and Richard Maize Foundation

17 ("Foundation"), the Green Youth Movement ("GYM"), and the Vista

18 Del Mar Child and Family Services ("VDM") with a public relations

19 firm that he hired to try to repair his image after pleading

20 guilty.

21      Maize hired the public relations firm in June 2007 after the

22 media publicized his guilty plea.  He was desperate to "get rid

23 of the blogs.  I hate them out there."  He wanted to "get the bad

24 things off google for good."  The firm agreed to "represent

25 [Maize] for strategic public relations and crisis communications

26 counsel for [Maize] in light of the legal matters [he was]

27 facing."  Maize and the publicist discussed trying to eliminate

28

from the internet the government's announcement of his guilty plea.  Maize repeatedly asked the publicist "how are things progressing with google?", "will the negative googles be eliminated?" and "how is it going with our google project?"  The publicist explained that:

> Taking on the great task of content suppression to be able to re-establish control of Web-based information is a surgical and time-intensive process, but it is one that can pave the road for your communication goal.
>
> . . .
>
> The ongoing work on reputation management, raising visibility positively for you and Rochelle along with the Foundation, securing affiliations with prominent causes and people, must maintain the highest level of credibility at all times.

(Exs. G (04/09/10 interview report of publicist); H (06/07/07 engagement letter); I (emails between Maize and publicist, 06/07 to 11/07).

The publicist had the idea to form the Foundation as a way for Maize to receive positive publicity.  The publicist explained the procedures to start up a foundation, coordinated the set-up of the Foundation's website, and wrote a draft Foundation mission statement.  The Foundation was incorporated in October 2007, about five months after Maize pled guilty.  (Exs. G at 2; J (06/15/10 interview report of publicist) at 1; K (Articles of Incorporation for Foundation, filed 10/29/07)).

In April 2008, when it was time to begin organizing GYM, Maize reached out to the publicist again.  He wanted to get non-profit status for the entity.  He also wanted the publicist to "help direct" him and his daughter with regard to GYM.  The publicist played an active role in advising Maize on obtaining a

1   business license, DBA, and bank account for GYM, as well as on

2   GYM's tax filings.  (Ex. L (emails between Maize and publicist,

3   04/08 to 09/08)).  According to the publicist, Maize thought that

4   GYM would help him repair his reputation in the community and

5   help for sentencing purposes.  (Ex. J at 2).

6       Also in April 2008, the public relations firm organized and

7   paid for children's lunches at VDM.  (Exs. G at 2; L at 1

8   (04/14/08 email from publicist to Maize)).

9       In presenting these facts to the Court, the government does

10  not minimize the positive impact that Maize's charitable

11  activities have had on those who benefit from them.  The

12  government also recognizes Maize's charitable contributions

13  before he pled guilty.  Even so, one can question why Maize felt

14  the need to, and did, coordinate his post-plea community

15  activities so closely with a publicist whose goal was to "achieve

16  the desired reputation management outcome in a high-profile, high

17  stakes case."  (Ex. H at 1).  This was a firm specialized in

18  public relations crisis management, not in charitable or non-

19  profit start-ups.  Overall, the publicist came to believe that

20  "Maize hired her firm more to influence Judge Pregerson at

21  sentencing rather than to clean up his public image."  (Ex. G at

22  3).[8]

23

24

25  _____

26      [8]   When Maize terminated the public relations firm, he
    still owed about $85,000.  Informal efforts between Maize and the
27  firm to resolve the debt were unsuccessful, and the firm sued
    him.  Eventually, the firm settled for $10,000, of which a
28  collection agency received $5,000.  (Ex. M (10/26/10 interview
    report of publicist)).

# III.

## GOVERNMENT'S SENTENCING RECOMMENDATION

**A.   Maize Deserves A Custody Sentence**

**1.   The Sentencing Guidelines Call For At Least A 97-Month Sentence**

The Sentencing Guidelines are the starting point and the initial benchmark. <u>United States v. Carty</u>, 520 F.3d 984, 991 (9th Cir. 2008) (citing 18 U.S.C. § 3553(a)). Here, the USPO properly calculated the low end of the Sentencing Guidelines range as 97 months imprisonment. (PSR ¶ 110). Maize concedes that the low end of the Sentencing Guidelines range is 57 months. (Maize Objections To PSR at 5). Hence, the Sentencing Guidelines, which must "be kept in mind throughout the process," <u>Carty</u>, 520 F.3d at 991, weigh in favor of a significant custody sentence by any measure.

Maize seeks downward adjustments for acceptance of responsibility and for his allegedly minor role. The USPO correctly concluded that neither is warranted.

**a.   Maize Has Denied Responsibility**

The USPO noted that Maize swore under oath, in support of his motion to withdraw his guilty pleas, that he had no intent to defraud and did not knowingly participate in any scheme. (PSR ¶ 60). Maize's flat-out denials of any criminal scienter cannot be squared with the necessary elements of the crimes to which he pled guilty.

<u>United States v. Newson</u>, 46 F.3d 730, 733 (8th Cir. 1995), is particularly on point. There, the defendant pled guilty but then moved to withdraw his plea and assert an entrapment defense.

18

The district court denied a reduction for acceptance of
responsibility, finding that by attempting to withdraw his guilty
plea, the defendant had failed to admit the essential element of
intent.   The Eighth Circuit affirmed, noting the district court's
finding that the defendant "had not demonstrated acceptance of
responsibility because he continued to contend that 'he committed
the offense . . . only for the reason [that] somebody else
tricked him into doing it.'"   Id.   This is exactly what Maize
claims, and his request for the acceptance reduction should be
denied for the exact same reason.   See also United States v.
Burrows, 36 F.3d 875, 883 (9th Cir. 1994) (affirming denial of
§ 3E1.1 reduction; "[e]ven after the trial, [defendant] placed
responsibility on others and accepted none himself . . . . [t]he
fact that [defendant] freely admitted committing the *actus reus*
of the crime does not change the fact that he maintained . . .
that he had a complete defense based on his purported lack of
*mens rea*.   [Defendant's] position was incompatible with
acceptance of responsibility."); United States v. Tonks, 574 F.3d
628, 632 (8th Cir. 2009) (district court entitled to deny
acceptance of responsibility where, notwithstanding previous
admissions, defendant expressly and unequivocally denied his
factual guilt); United States v. De Leon, 603 F.3d 397, 408 (7th
Cir. 2010) ("blaming someone else for one's own actions is not
the sort of 'genuine contrition' the acceptance of responsibility
reduction seeks to reward").

     Maize claims he is entitled to the acceptance reduction for
reasons set forth in the commentary to § 3E1.1.   (Maize
Objections To PSR at 4).   Maize is incorrect.   He did not

"voluntarily" withdraw from the criminal conduct.  Instead, he
withdrew only when his hand was forced by an appraiser's
discovery of the scheme (Maize Sentencing Position at 23), and he
continued to cover it up for almost another year.  Maize did not
pay the $2,750,000 in restitution voluntarily prior to
adjudication of guilt.  Instead, he paid it only as a result of
his Plea Agreement and after being found guilty by this Court.[9]
Contrary to his assertion, Maize did not "voluntarily" resign his
employment with RBC; he resigned in lieu of being terminated
because RBC knew (after taking millions of dollars in losses on
loans that Maize helped procure) that it could never do business
with him again.  Maize meets none of the criteria for an
acceptance reduction, and should not receive one.[10]

> **b.   Maize Did Not Play A Minor Role In The Fraud**

The USPO concluded that Maize was an average participant in
the fraud, who did not direct his co-conspirators or take
directions from them.  (PSR ¶ 57).  The USPO is correct.

A downward role adjustment is only available "for a
defendant who plays a part in committing the offense that makes
him <u>substantially</u> less culpable than the average participant."

---

[9]   Maize paid some money to RBC before being found guilty,
but that was only after RBC had discovered the scheme and Maize's
role in it.

[10]   Maize appears to believe that the USPO's recommendation
for a custody sentence essentially constitutes punishment for his
exercising his right to move to withdraw his guilty plea.  (Maize
Objections to PSR at 5).  Not so.  The USPO recommended against
the acceptance reduction because of what Maize said in his
declaration, not because he made a motion.  (PSR Third Addendum
at 2).  In light of all the factors, including that Maize's low-
end Sentencing Guidelines sentence is 97 months, the USPO fairly
concluded that a sentence of straight probation is untenable.

Sentencing Guidelines § 3B1.2, comment. (n.3(A)) (2001) (emphasis added).  Maize used his connections and prestige in the mortgage banking industry to help push about 40 heavily inflated loans through the underwriting process.  As discussed above, he ran interference when loans were in jeopardy so that Fitzgerald and Abrams could close the transactions.  When he was forced to withdraw, he covered up the fraud, lied on his tax return, and stood by as Fitzgerald and Abrams proceeded to take Lehman for about $24,000,000 more.  This is not a defendant who can be said to be substantially less culpable than the average schemer.

> **2.   The § 3553(a) Statutory Factors Firmly Support A Custody Sentence**
>
> > **a.   The Nature And Circumstances Of Maize's Crimes, And His History And Characteristics, Justify A Custody Sentence**

Maize's crimes were egregious and fully warrant a custody sentence.  As a major figure in the high-end mortgage industry, he put his imprimatur on loans he knew to be false and fraudulent.  He got hundreds of thousands of dollars in kickbacks on those loans.  He took pains to hide many of the kickbacks, including by instructing Abrams to pay them to cash, to Maize's credit cards, and to Maize's wife.  His cover-up of the fraud proved to be just as damaging as his participation in it -- more so, if measured by the losses sustained during the cover-up phase.

Maize claims that he had no financial incentive to participate in the fraud, pointing to the first four loans (on which he only made "standard commissions") as evidence of this. He says he agreed to process the loans as a personal favor to

1    Abrams.   (Maize Sentencing Position at 15).   What Maize calls a

2    "standard commission" was serious money, even ignoring the

3    kickbacks he made on top of the commissions.   Maize admitted

4    knowing about multiple lies in the Alta Drive loan package.

5    (Factual Statement ¶¶ 26-27).   On that home, Americorp funded the

6    loan for $2.806 million, but sold it to Lehman for $2.853

7    million.   (Ex. 263 at 3; Ex. 275).   The difference (almost

8    $47,000) was profit to Americorp.   Americorp (by that time owned

9    by RBC) made similar profits of about $40,000 each on the other

10   two homes discussed in Maize's Plea Agreement.   (Factual

11   Statement ¶¶ 29, 32).

12        With regard to Maize's history and characteristics, the

13   Court would do well to keep in mind his prior mortgage fraud

14   against Countrywide.   One major reason why Maize's claims about

15   being bamboozled by Fitzgerald and Abrams are so far-fetched is

16   that he committed this highly similar fraud years before he met

17   them.   Maize never once mentions the Countrywide fraud in any of

18   his approximately 80 pages of sentencing briefing.   To the

19   contrary, he makes the amazing claim that his record "is striking

20   for . . . his lack of any other type of dishonest or questionable

21   behavior in his long career in real estate."   (Maize Sentencing

22   Position at 29).   Maize has no prior convictions, has

23   participated in charitable activities (although his motive for

24   some of those activities is questionable), and has a large

25   measure of support from family and friends.   These are legitimate

26   reasons to grant him a very large downward variance, as the USPO

27   and the government recommend.   The USPO's recommendation amounts

28   to a 50-month downward variance, or more than 50% off the low-end

1  Sentencing Guidelines sentence.  But given the aggravated nature

2  of Maize's crimes, the positive aspects of his history and

3  characteristics do not justify straight probation.

4      Maize claims that the USPO believes that he "has done so

5  much more than anyone else involved in this case to try to make

6  amends and so much more than most white-collar offenders in the

7  Probation Officer's experience."  (Maize Sentencing Position at

8  4).  This is disingenuous.  The citation is to the USPO's

9  original recommendation letter, dated May 24, 2010.  The USPO

10 removed this passage in its entirety in the revised letter, dated

11 July 5, 2011.  After Maize denied all responsibility in his

12 declaration, it is clear that the USPO does not believe he "has

13 done so much more than anyone else . . . to try to make amends,"

14 whatever the agency initially may have thought of him.

15         **b.   A Custody Sentence Will Reflect The Seriousness Of**
   **Maize's Offenses, Promote Respect For The Law, And**

16              **Provide Just Punishment**

17     Maize's crimes were very serious.  His sentence must be

18 sufficiently serious to match the crimes.  A straight

19 probationary sentence will not satisfy that sentencing

20 requirement.

21     The sentence must also promote respect for the law and

22 provide just punishment.  Maize's concealment of hundreds of

23 thousands of dollars of dirty money, and his cover-up of the

24 fraud, reveal a defendant who himself had little if any respect

25 for the law.  Probation for this defendant will not be viewed as

26 a measure of just punishment.

27

28

                    c.   **A Custody Sentence Will Deter Criminal Conduct**

This fraud has received significant media and public attention. Maize was so concerned about it that he hired a public relations firm in an effort to minimize the negative publicity. Because Maize's sentence may well garner new attention, general deterrence is especially important here. If the sentence is unjustifiably lenient -- such as straight probation -- future potential mortgage fraudsters could certainly conclude that the upside benefits trump the downside risks. The Court should take care not to send that message.

          d.   **A Custody Sentence Will Avoid Unwarranted Sentencing Disparities Among Similarly-Situated Defendants**

The Court has already sentenced Maize's co-schemers, and thus has several guideposts to consider in sentencing Maize. With respect to avoiding sentencing disparities, the following is clear.

First, there is absolutely no justification for sentencing Maize to no time when Schiff received 6 months in custody and 6 months home detention. Schiff pled guilty to only a single tax count. He specifically denied participating in the fraud, and was not convicted of that conduct. Maize claims that "his knowledge and conduct was very similar to, if not identical to, Mr. Schiff" (Maize Sentencing Position at 60), but that does not square with what he and Schiff pled guilty to. Maize admitted that he brought Abrams' kickback offer to Schiff. (Ex. E at 2). It would be unfair to Schiff and inconsistent with equitable sentencing to sentence Maize to probation.

Second, Maize should be sentenced to less time than Rizk, who received 36 months.  Rizk was the chief appraiser in the fraud, and thus was directly responsible for the outrageously inflated valuations of the homes.  Furthermore, she inflated appraisals on homes in the second part of the scheme, when Maize was covering it up but no longer actively participating.  For these reasons, Maize deserves a lower sentence.

Third, the probationary sentences of two of Fitzgerald's and Abrams' employees (Nicole LaViolette and Timothy Holland) do not support a probationary sentence for Maize.  As the Court recalls, those sentences were based on, among other key factors, their significant cooperation (including against Maize), as well as highly personal issues unique to them.  Those factors are not present here.  Maize did not cooperate such as to merit a § 5K1.1 departure -- instead, he waited until many of his co-schemers, including Abrams, LaViolette, and Holland, had been cooperating against him for years.  Unlike Maize, LaViolette and Holland never went to college (much less obtain an accounting degree) and never had any professional real estate licenses.  Nor does Maize have the kind of personal issues that LaViolette and Holland had.

Fourth, the 18-month sentence imposed on Abrams' employee Jamieson Matykowski is a relevant guidepost.  As the Court knows, Matykowski was integrally involved in the fraud from beginning to end.  However, he cooperated early and extensively with the government, including at trial.  Furthermore, unlike Maize, Matykowski had no history of mortgage fraud before going to work with Abrams.  Indeed, he was only in his twenties when he met Abrams, never graduated from college, and had only about two

years experience in the mortgage industry.  Before that, he had worked as a waiter and a bartender.  Moreover, Matykowski made less per inflated loan than Maize did.[11]  In sum, Matykowski had nowhere near the pedigree or level of discretion and decision-making that Maize had in the mortgage field.  In every sense of the word, Maize was Abrams' peer.  If during the fraud an inflated loan was going south, there was nothing Matykowski could do about it.  That was when Maize brought his expertise and connections to bear.  Maize, not Matykowski, was the insider at (and a fiduciary of) RBC and had the connections to Aurora.  For these reasons, the government believes that Maize's sentence should be at least as high as Matykowski's.

**B.    The Court Should Order Maize To Pay Significant Additional Restitution**

The government agrees that Maize should receive credit for restitution totaling $3,619,041.  Maize agrees that the total loss to RBC during the time that he participated in the fraud is more than $18.2 million.  (Plea Agreement ¶ 18(a)).  The Court must decide whether to order him to pay additional restitution to RBC, and to what extent.  This is within the Court's discretion.  Here, the government discusses three factors bearing on this decision: (1) Maize's present ability to pay significant additional restitution, in contrast to his previously-sentenced co-schemers; (2) the reasons why Maize's claimed additional "forfeitures" were not restitution payments and should not be

_____

[11]    At most, Matykowski made about $6,000 per inflated loan.  (Matykowski Plea Agreement ¶ 52).  In contrast, each kickback to Maize averaged at least $7,000, based on the typical loan of at least $1,400,000.  (Exs. 3500, 3501).

1  treated as such; and (3) why the Court should not postpone its

2  restitution decision until after the conclusion of the related

3  civil litigation.

4      **1.   Unlike All Other Defendants In This Case, Maize Is**
           **Still Very Wealthy And Can Easily Pay Additional**
5          **Restitution**

6      In deciding whether and to what extent to apportion

7  liability for restitution, the Court should consider, among other

8  factors, the "economic circumstances of each defendant."  18

9  U.S.C. § 3664(h).  Maize acknowledges this, but claims (without

10  actually discussing any details of his present financial

11  condition) that he has reduced ability to pay restitution

12  compared to his financial condition in 2003.  Even if that is

13  true, a close look at his circumstances shows that he can easily

14  pay significant additional restitution.

15      In his most recent financial statement (filed this month),

16  Maize listed assets totaling more than $7.14 million for 2011.

17  This excludes assets solely in the names of his wife and

18  children; if those assets are included, the total is more than

19  $9.4 million.  He listed liabilities of (at most) $2,432,957.[12]

20  Thus, his present net worth is nearly $5 million, estimated

21  conservatively.  Maize disclosed a net monthly positive cash flow

22  of $20,799, even including various claimed expenses for luxuries

23  that could easily be eliminated or reduced.  A sizable portion of

24  his monthly income appears to come from passive returns on

25  investments and loans, as opposed to salary or commissions;

26

27      [12]   This does not include $1,418,797 owed on his home,
    because that debt was already used to reduce his total assets to
28  about $7.14 million.

27

1  presumably he would continue to receive the passive income even

2  if he is placed in custody.

3       Maize's significant assets and income stand in marked

4  contrast to his co-conspirators.  By the time they were

5  sentenced, they had little or nothing -- even including

6  Fitzgerald and Abrams, who had Court-appointed counsel at their

7  sentencings.  LaViolette and Rizk had a negative net worth and a

8  negative monthly cash flow; Holland had a negative net worth and

9  a positive cash flow of just over $200; and Matykowski had a

10 negative net worth and a positive cash flow of just over $2,000.

11 None of those defendants had passive income from sources that

12 would continue to pay them while they were incarcerated, nor did

13 they have anywhere near the magnitude or diversity of Maize's

14 assets.  Nonetheless, the Court ordered each of them to pay more

15 than $40 million in restitution, based on the full amounts of the

16 victims' losses and the defendants' active participation in the

17 scheme.  Up to their sentencings, these defendants were working

18 as a veterinary assistant (LaViolette), an auto mechanic

19 (Holland), a bartender (Matykowski), or not working at all

20 (Rizk).  They have none of the business connections or acumen

21 that Maize has, and none of his talent or ability to make money,

22 but their restitution judgments will follow them for many years.

23 Contrary to Maize's claim, he actively participated in the

24 scheme.  He can easily pay additional restitution, and he should

25 be ordered to do so.  See, e.g., United States v. Sensmeier, 361

26 F.3d 982, 990-991 (7th Cir. 2004) (affirming district court

27 decision not to apportion restitution, even though no fine or

28 interest; defendant could make immediate payments of some amount,

28

1   as he was young, completed high school and some college, had

2   stable employment history, was gainfully employed as a mechanic

3   at the time the charges were brought, and had supportive family).

4        **2.   Maize Has Paid No More Than $3,619,041 In Restitution**

5        Maize claims that in addition to the amounts required by and

6   referenced in his Plea Agreement (totaling $3,619,041), he also

7   "paid or forfeited to RBC an additional $4.1 million," which

8   should be deemed restitution.   (Maize Restitution Memorandum at

9   15).   Maize is wrong.

10       First, Maize claims that he had to forfeit various "bonuses"

11  to which he was entitled in the year 2003, and that the

12  forfeiture of these bonuses should be deemed restitution.   One of

13  these "bonuses," he says, was an "earn-out bonus" of $814,761 for

14  the first six months of 2003.   (Howard Decl. ¶ 17).   However,

15  Americorp's earn-out payments for a given year were calculated as

16  50% of the "earn-out net income" generated by Americorp for that

17  year.   (Howard Decl., Ex. C at § 3.4(b), p.17).   If the "earn-out

18  net income" for a given year was zero or less, then no earn-out

19  payment was due.   (Id.)   In turn, "earn-out net income" was

20  defined as net income generated by Americorp minus "the amount of

21  any Loss incurred by [Americorp] in . . . any prior Earn-Out Year

22  and not offset against Net Income in prior Earn-Out Years[.]"

23  (Id. at § 3.4(a)(ii), p.15).   The reality, of course, was that

24  Americorp incurred huge losses in 2001 and 2002 due to Maize's

25  fraud, which swamped all of its revenue for those years and

26  resulted in negative net income (i.e., a loss).   Nonetheless,

27  Maize received his earn-out payments for 2001 and 2002, and the

28  losses he helped to cause during those years were never used to

1  offset his earn-out payments for those years.  Under the

2  contract, those losses had to be used to offset income for 2003,

3  and thus, no earn-out payment was due to Maize for 2003.

4      Second, what Maize claims to be his "guaranteed" and

5  "performance" bonuses (totaling $180,000), which he says he

6  forfeited, appear to come from his Employment Agreement and its

7  Amendment, not from the acquisition contract by which RBC bought

8  Americorp.  However, pursuant to the Employment Agreement as

9  amended, Maize would only receive those bonuses if his

10 "employment [had] not been terminated by [RBC or Maize] on or

11 prior to the last day of such fiscal year[.]"  (Howard Decl., Ex.

12 D at § 2.2, p.4; Ex. E at § 2(e), p.2).  Maize resigned from RBC

13 in lieu of termination well before December 31, 2003.  Therefore,

14 he was not entitled to any "guaranteed" or "performance" bonuses

15 for 2003.

16     Third, when Maize resigned, he stated:

17     I acknowledge and agree that I have received all
       benefits and amounts due to me under the Employment
18     Agreement [except COBRA and retirement plan benefits]
       and that [except for those benefits] I shall have no
19     further recourse against [RBC] pursuant to the
       Employment Agreement.

20
(Ex. N (07/18/03 Maize resignation letter)).
21
       Maize also signed a Release of Claims.  (Id.)  Maize made
22
identical acknowledgments in the contract by which he and Schiff
23
re-acquired Americorp from RBC after the fraud was discovered.
24
(Howard Decl., Ex. F at §§ 8.1, 8.2, p.19 (Maize "acknowledge[s]
25
and agree[s] that [RBC has] completely performed all of [its]
26
obligations and duties . . ., including . . . any Earn-Out
27
Payments and any Bonus Payments[.]")).  Despite acknowledging
28

that he received everything due to him under his employment
contract, he now claims he was owed more, and that his so-called
involuntarily forfeiture of those amounts should be credited to
him as restitution.  The Court should reject his inconsistent
claim.

Finally, Maize claims credit for "$7.7 million [in
restitution] he has already paid."  (Maize Restitution Memorandum
at 16).  That figure is supposedly borne out by Exhibit B (the
summary chart) to his accountant's declaration.  However, the
$7.7 million figure is only supported by totaling all the amounts
in Section V of that chart.  Section V states that the 2003
Earnout Bonus was $1,629,522, whereas in Section IV, that amount
is listed as only $814,761.  Other line items are similarly
doubled in Section V as compared to Section IV.  On closer
inspection, it is clear that Section V includes Schiff's share of
supposedly-forfeited bonuses and commissions, whereas Section IV
includes only Maize's share.  Even if the Court treats these
unearned bonuses and commissions as restitution (which it should
not), one thing is clear: Maize did not "forfeit" or "pay" any of
Schiff's money to RBC.  He cannot piggy-back off of Schiff's
share of the settlement.

**3.   Pursuant To The Plea Agreement, The Court Should Enter
A Restitution Judgment Against Maize Now**

Maize claims that the Court should postpone a restitution
decision because RBC could recover money from the receivership
estate.  (Maize Restitution Memorandum at 17).  That claim is
foreclosed by Maize's Plea Agreement.  There, the parties agreed
that "[i]f, on or before the date that defendant is sentenced,

31

RBC receives" money from the receivership estate or other
sources, then that money should serve to reduce the amount still
owed by defendant.   (Plea Agreement ¶ 27 (emphasis added)).
Maize further agreed that the formula that the Court should use
to calculate his additional restitution should account for
"monies received by RBC, on or before the date that defendant is
sentenced." (Plea Agreement ¶ 28(d) (emphasis added)).   In other
words, Maize agreed that the Court should make the restitution
decision when he is sentenced, and should not postpone that
decision just because RBC might recover from other sources later.

Furthermore, if RBC does recover later from the receivership
estate, and such recovery meets the requirements of 18 U.S.C.
§ 3664(j)(2)(A), then the USPO will reduce the outstanding
balances due from Maize and his co-conspirators during their
supervised release terms.   It is well-established that a victim
should not receive double recovery in criminal restitution.
Where defendants are held jointly and severally liable (as Maize
should be here with his co-conspirators), such double recovery is
avoided by crediting their outstanding balances by any amounts
received.   This is the standard practice here.   Victims in a
criminal case should not have to wait until related civil
litigation is concluded just to obtain restitution judgments
against the criminals who defrauded them.   Here, the Court did
not postpone any co-conspirator's sentencing (including their
restitution orders) for this reason.   More than four years have
passed since Maize signed his Plea Agreement.   It is time to
order him to pay the restitution that the Court deems
appropriate.

C.  **The Court Should Place Maize On Three Years Of Supervised Release Following Imprisonment**

The government agrees with the USPO that Maize should be placed on three years of supervised release after imprisonment, under the terms and conditions set forth in the USPO's recommendation letter.  These include the terms to which Maize agreed in the Plea Agreement.

IV.

CONCLUSION

The government recommends a sentence of 18-27 months imprisonment; additional restitution; 3 years of supervised release; and a mandatory special assessment of $500.

33

## CERTIFICATE OF SERVICE

I, **YENI GOMEZ,** declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of: **GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT RICHARD A. MAIZE**

**service was:**

[X] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[ ] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[ ] By hand delivery addressed as follows:

[ ] By facsimile as follows:

[ ] By email as follows:

[ ] By federal express as follows:

**Lori Pascover**
**United States Probation Office**
**312 North Spring Street**
**7th Floor**
**Los Angeles, CA 90012**

This Certificate is executed on August 29, 2011 at Los Angeles, California. I certify under penalty of perjury that the foregoing is true and correct.

_____
YENI GOMEZ